First case this morning is Andersen Corp v. Pella Corporation. Mr. Shoots. Thank you, Your Honor. May it please the Court, my name is Ron Shoots. I represent Andersen Corporation with me in court today. And on the briefs are Becky Thorson, Kusala Akhundwale, and Mary Petrowski. In this case, the trial court judge acted not only as the judge, but as the expert, the inventor, the jury, and the executioner. More specifically, the mistakes that the trial court judge made in this case were that the trial court ignored the teachings of KSR at several points. At summary judgment, the district court, to the extent that one could divine any factual analysis from the opinion, resolved all factual disputes against the moving party. My point, Andersen, what factual disputes do you think were resolved against the moving party? Your Honor, the key factual dispute here in the first area that the court made was ignoring KSR, what KSR said. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. You're telling me a factual point that he resolved, not misinterpreting the law. So let's come back to the factual point. The factual point, Your Honor, is that the district court determined, either implicitly, it appears implicitly in the opinion, that TWP, the material that it bases its opinion on, was in the same field of endeavor. Either the court did that or found that it was not in the same field of endeavor, but that it could be used as a starting point by one of ordinary skill in any event. So what I'd like to do is focus on TWP and the facts around TWP. But the TWP is a screen, albeit an electromagnetic shielding screen, but why wouldn't I look at all screens if I'm looking for a perfect insect repellent screen? I'm troubled a little bit by why that is such a factual leap in the arts. Well, the inquiry is not whether I would or the district court judge would or any court of this panel would look at it. It's whether one of ordinary skill in the arts would look at it. And that's precisely the point. One of skill in the arts is going to look at all screens, aren't they? No, they're not. Why would someone reject this particular screen? Why? Because this particular screen, your honor, was an electromagnetic shielding, fine mesh screen. Let's look at some of the characteristics of this screen. And even assuming that one of ordinary skill in the arts came across it, what would they think? And as I make these points, you will find none of them addressed by the district court. So one comes across this screen on a website for TWP. Also on the website, this particular manufacturer sells insect screens. So the manufacturer knows what an insect screen is. But this particular screen is an optical-grade fine mesh. The size of the screen elements are finer than a human hair. Well, but you see, that's exactly what I as one of skill in the arts am looking for. Because I'm trying to make my insect repellent screen invisible. So I want the fine mesh screen. So this is the first one I look for, isn't it? No, it's not. Okay, well help me out. It's not the first one you look for because when you run across it, you see that it's a fine mesh screen sandwiched between two plates of glass. And as such, an insect screen designer who has no understanding of optics and no understanding of physics, and this is optical-grade fine mesh that costs $15 a square foot. The screen that I as one of ordinary skill in the arts designing insect screens is used to dealing with costs $0.07 a square foot. So there are neither design incentives nor market incentives to use this material. The design incentive, in fact, is the opposite. If I have to design an insect screen and I've got to put it in a fenestration unit and mass produce it, I'm not going to use material that's as fine as a human ear or sandwiched between those. What are you saying? You're saying kind of that the fine mesh TWP screen sort of caught away from itself. Yes. At least for use in terms of an insect screen. Yes. The underlying facts around TWP fit into several pieces of the Supreme Court's direction in the KSR case, one of which is not the same field of endeavor, another of which is it teaches a way. So what does this teach one, skill in the arts? Look at it. Geez, there's no way I'd want to touch this stuff. There's no indication that it's ever existed on its own in any kind of a frame, whether it be a window or a book. Given the level of skill in the arts, because I mean, by recollection, the court and the parties were all in agreement that we had a fairly low level of skill. It was just someone who would be in the business, almost like a contractor or a carpenter, putting screens into frames and then putting them in houses. That is correct. That is the only thing the parties agreed on. And quite frankly, the only thing the judge got right for Lowell in this case was the level of ordinary skill. And it was Lowell. And in fact, I think that some context about this issue, the defendant Pelt, for example, has been in the business since 1925. And although there has been a goal of making insect screens less visible for all the reasons that have been cited in the briefs, no one, not the hundreds and hundreds of employees of Pelt over decades and decades, ever thought about using this. The actual – Pelt would like to dismiss the invention story, but I think the invention story is relevant here at several levels. The inventor is – Let me ask you one question. I went through – obviously, KSR influenced the district court here because the judge had originally, I guess, denied some judgment. And then KSR came out and said, I ought to look at that quite properly. And I looked at it. Seriously, I went through and I marked in blue and red my copy of what's almost like a rainbow coalition, so to speak, of, you know, the red is something that maybe helps the appellee here and blue is something that helps you. And there's a little bit of each here. But I just want to ask you, the last part, the very last part of KSR, the court took the Federal Circuit to task for saying there was a dispute over an issue of material fact. And the court in KSR reminded us in part four of its opinion that, you know, ultimately, obviousness is a question of law. And it said that – I think it said that, you know, a conclusory expert declaration or affidavit or whatever, a court presumably cannot provide a basis for finding disputed issues of material fact, so as to defeat summary judgment. And I think you certainly rely, as one would expect, on – I guess it's Mr. Armstrong's report, his testimony. Yes. What is your response to that part of KSR where they admonish this about summary judgment? Well, when they do so, of course, they do so in the context of the invention in the KSR case. And the reference that they relied – I think his name was in the panel part. And the expert report in that case was very conclusive. Unlike this case, where Mr. Armstrong – and we quote liberally not only from Mr. Armstrong's report, but also from a 30d6 deposition of a manufactured representative from TWP. Is that to read? I can't remember. I think that's correct, Your Honor. But among the things that the corporate representative stated was that the material is usually placed between glass. It's wishy-washy, flimsy, so flimsy we ruin as much as we cut because it is too flimsy. That it's never installed in frames. He testified he wouldn't even think to do that. It's between glass. It's so fragile you can't hold it. This isn't merely a case where Mr. Armstrong said, I don't think he'd start. Mr. Armstrong went through his own failings. He talked about his efforts to design a less visible inkscape screen using fishing wire, using plastic with holes in it. And so it just isn't conclusion. There are a lot of facts backing this up. And of course, the Supreme Court gave some guidance to everyone out there about some things you look at. What are the design incentives? What are the marketing incentives? And again, as we talked about here, the design incentives teach away from using this material. Not only the nature of the material itself, the cost of the material, the fact that even the manufacturer never represents it. And so you're saying that the Armstrong testimony, the Armstrong report, the Reid testimony, I guess some of the documentary material, all of that takes your case out of the conclusory assertion of non-obviousness situation. Yes, it does. These are a lot of facts surrounding this. And it's not just that it takes it out of the conclusory aspect. There is no analysis by the district court. I mean, the district court here really did just put itself in the position of saying, eh, I think it's obvious. And the Supreme Court... The district court did pick up on it. It seemed to me it was pick up on the common sense theme that you see, I think, in KSR. And that's not unreasonable in a case like this where you have... It's an important thing here to screen, but yet it's not state-of-the-art science. If you look at... Let's take a look briefly at the common sense aspect. Would someone of relatively low skill in the art apply some common sense to say, I'm going to take material that's only existed between two pieces of glass. It's not bonded. It's thin as a human hair. You can poke a hole through it. It costs $15 a square foot. The manufacturer doesn't even represent that it can be used as insect screen. All those facts, would an ordinary low skill in the art designer have used common sense to do that? No. Well, you at least have a chance to make that argument to a jury. That's correct. I mean, perhaps at the end of the day, Heller prevails on that before a fact finder, but there has been no analysis of those facts in the district court's opinion, and to the extent that the district court ruled against us. It would have implicitly found all those facts against us, and that it cannot. Well, is that really fair to say that the district judge did do some analysis? He said, all your inventor did was take the screen, paint it black with spray paint, and stick it in a door. And it was well known to paint it black to reduce the reflectance and to strengthen the bonds. That illustrates exactly another problem that the district court did. The district court doesn't know that except with how it resorted to the invention story and the fact itself. No, there was testimony from your own witnesses that admitted that. Yes, the inventors themselves. In other words, he started with what the inventors in fact did. He started with the patent and their testimony and worked backwards. I read there that the inventors said it was well known that spray painting it black would strengthen the bonds. You can take material that's unbonded, and if you paint it black, it may bond. That's not particularly in dispute, but you have to start with something first before you get to that point. It started with TWP, and that was in Congress. It seems to me that your best argument is to concede everything except one thing, and that is whether or not it was within the field of endeavor, the TWP. I read the KSR several times looking for a field of endeavor, and there's only one such. Actually, that cuts against you. It says when a work is available in one field of endeavor, design incentives or other market forces can prompt variations of it, either in the same field or a different one. So that seems to be wiping away this distinction that used to be recognized in fields of endeavor. With all due respect, Your Honor, I would submit that that language actually works in our favor and directs a trial court judge that if you are going to go down that route, you need to look at market forces and you need to look at design incentives before you can say, if it's outside the field of endeavor, it would have been used anyway, and the district court did not do that here. In fact, all the evidence on design incentives, as I've talked about, and market incentives would have militated against using it. What do you think the law is on the field of endeavor analysis and how a judge or a jury is supposed to go about deciding the field of endeavor? What is the significance of that? Well, the field of endeavor analysis, I suppose, is an offshoot of what might have been at one time considered the non-analogous prior art. In other words, certainly I know that I'm into my rebuttal time. Please take your time. Thank you. We've only got one case, so you can run over. Thank you, Your Honor. Previously, there had been discussions in this court about non-analogous prior art, and there had been an analysis not unlike whether this was in the field of endeavor or out of the field of endeavor. I would submit they're flip sides of the same coin. So that being said, how do you go about determining whether something is in the field of endeavor or not? You start with the ordinary skill in the art, and if the ordinary skill in the art is low, the world view that one of that low level of skill in the art is going to have is going to be relatively narrow. You know, an example that I… Why doesn't that cut both ways? One of relatively low level skill may try everything and anything without regard to the optics and the physics, and that would lead them precisely to this screen. I don't think that one of that low skill would go beyond. They're not innovative. I think there's some language in the KSR case that talks about that. They're not an automaton, but they're not necessarily innovative. This is an example that I use sometimes is that, you know, what's known to people. Nothing is known to a slug, and everything is known to God, and things in between vary. And the closer you are on the lower end of that scale, the more narrow your world view is. Again, just asking the question and having the debate, though, I think illustrates that that's another area that's rife with factual disputes, and the district court judge in this case really did nothing more than himself make a conclusory allegation that, you know, the district court, somebody would look beyond, and there's some indication they'd look beyond. I think the quote, I have it here, from the district court said, it was a simple act of common sense rather than an invention from an insect screen designer of ordinary skill to look beyond the common insect screen materials to find screen material that was hard to see. So what can you make out of that statement by the district court? One thing you can make out of that is perhaps the district court recognized this was not in the field of endeavor, and then made the leap that, okay, it's not in the field of endeavor, but one of ordinary skill would use it anyway. To do that, the Supreme Court gives pretty clear guidance here that you need to look at design incentives and marketing incentives, and there was none of that in the district court's opinion, despite there being a substantial amount of that in the record, and, you know, relied upon by us to argue that there's no way you would have started as one of ordinary skill to market this material. Can I ask a different question? The way this claim is drawn, and your opponent says this, but it seems to me to be true, so tell me if it's wrong about this, that your side, that this is the lawyer now who did the patent prosecution, goes to the Home Depot, and gets all the commercially available specifications, and then calls a claim that is just slightly better than all of those specifications. So it's not drawn to the TWP plus black paint. It doesn't say that at all. It says certain level of transmittance, certain level of reflective, certain PSI strength, and certain diameter. So is it really, is it one way to look at this case to say that what matters is not the particular way that your inventor came up with TWP, that that's just a subjective thing, but to look at it somewhat, so how, what would be the easiest set of steps that a person of ordinary skill in the art could take to reach at least one body of the way the claim is drawn? Let me repeat that. The easiest set of steps that a person of ordinary skill in the art could have taken to reach at least one, all you need is one embodiment that would be obvious to knock out this claim. So if that's true, then how hard would it be for somebody to say, okay, we got the existing screen as, let's just say, .15, 015. So let's tell the manufacturer, give us .013. That'll be just a tiny bit better than the existing prior art. That's going to fall in your claim. And it had nothing to do with TWP. It's just, it seems to me very easy to, for a manufacturer to make an embodiment that would be obvious under your very drawn claim. So, now that's not the way the district judge approached it, I understand that. But to me, this is a, I'm worried about being able to draw a claim like this and claim the universe of everything, every possible improvement from here to eternity based upon one embodiment and claiming embodiments that are much different than what you've got here. So why isn't that a good question to ask? It's a great question. I've got three answers for it. The first response is that when the patent attorney in this case drafted a claim, unlike any patent attorney who goes to draft claims, they want a good handle on what is the prior art that exists out there and how do I draft a claim that gives me the broadest possible scope but doesn't overlap with any of it. And so to the extent that, I don't think they necessarily went to Home Depot to the extent that someone did that, they were doing their job in trying to draft as broad a possible of a valid claim. So that's the first thing. The second thing is to the extent that those claims were drafted beyond the scope of the disclosure, that's a Section 112 problem if that's an issue. Of course, we don't think it is and that hasn't, I don't think, necessarily been raised here. It's certainly not a misappeal. But that is, again, a check on somebody. I sense, Your Honor, that you think there might be some, you know, abuse might be the wrong word, but you appear to be taking some offense to what was done here. But there is a check on that. Section 112 of the Patent and Statute provides a check on that. The third response to that is that someone manufacturing the screen, if you start to plot out where this claim goes, has a lot of maneuver room outside the scope of the claims. And in this particular case, Pelley did not decide to, you've got to remember, one of the amendments here was to amend the claim to say not about .04 for reflectivity, but .04 or less for reflectivity. So all Pelley had to do to avoid this problem entirely was go .045, and they decided not to do that. So there are lots of... I don't think it was .039. If they go .039, you're within the claim. But that's not what the TWP would see the thing. You didn't draw this in terms of TWP plus Black Bank. You said you didn't even mention it in the claims. What you mention in the claims would be very broad. You pick up everything that has not yet been done. That's really what it comes down to. Any tiny improvement over the prior art, you try to pick up. I don't believe that we did that, Your Honor, and to the extent that Pelley wants to assert that the claims are not supported by the specification and the disclosure in the specification, they're free to do that under section 1. Well, yeah, they can do that too. But I'm saying that to invalidate a broad claim, all you've got to do is find one embodiment out of millions that falls within the definition, and if that one is obvious, it doesn't matter that there are 900,000 that are not obvious. Well, there are a couple of responses to that. First of all, we're not dealing with a situation of anticipation, so they have not found something that they have said, this single piece of prior art anticipates these claims and falls within it. It's important to keep that in mind. What they're arguing is that TWP would have been obvious to start with it, but that's not the end of it. It would have to be modified to manufacturing steps of painting or coloring the body. But painting it black and putting it in a frame are pretty elemental, right? The painting it black, people have been painting screens black. It goes back to 1918 or so, right? People have been painting screens probably at least as long as 1918. I think there's some evidence in the record that Buffalo White Awards people painted some screens in 1916. That's correct. That alone, I would point out, though, does not necessarily result in a reduced visibility insect screen because the problem I'm trying to solve is an invisible screen. We know that blackening the screen facilitates that. Why wouldn't I start with the smallest mesh I have, TWP, paint it black, and put it in a window frame? Because that might not necessarily result in reduced visibility insect screen. Let me explain why. There are a number of factors that go into reduced visibility, including wire diameter, spacing, and color. The number of variations of that are actually enormous when you start to look at it. You take a lot of very thin wires, but they're spaced very, very closely together, and you paint it black, you're going to look and see a black splotch. You're not going to see something that's necessarily reduced visibility. The only thing you can say for certain, painting something black does, is reducing its reflectivity. And reducing its reflectivity is a good thing for trying to get a reduced visibility insect screen. It's not the end of the inquiry. Because if you've got the screen elements too big, or even if they're very small, and placed too close together, but following up on a point that you made, Judge Rader, there was evidence in the record, again through Larry Armstrong, our expert, that it was counterintuitive to think to make an insect screen at all, putting more wires closer together. This was a 50 by 50 mesh in this case, and the package goes on and talks about what the state of the art of insect screening was, typically 18 by 16 mesh, with much thicker wires. Okay, thank you, Mr. Shoeswell. I'm going to hear from Mr. Van Ork, and we'll give you your three minutes of rebuttal time when you're done. Thank you. Mr. Van Ork, you can take what time you need. You've been pretty generous with time today. Thank you very much, Your Honor. This is a summary judgment case, because there are no undisputed facts on the three primary grand factors, and based on those factors, it was obvious for a person of ordinary skill to conduct this. The scope and content of the prior art are a factual question. Well, there are certainly factual underpinnings, but it's ultimately a legal determination, and none of the facts are undisputed. But the only fact we're fighting about here is the scope and content of the prior art, and that's factual, right? Well, as I said, there are factual underpinnings, and the facts in this record are undisputed. We know what the TWP screening was. You've gone to the heart of the issue. Why would one of skill in the art choose a screen which is so delicate you can easily poke your finger through it and is flimsy and has been only used for the medical field and military uses in electromagnetic shielding? Why would one of skill in the art even think of using a $15 versus a $0.06 sort of comparison screen? I have about six answers to that, so let's start with the fact that… I've got one up here. Let's start with the fact that before Anderson did anything to the TWP mesh, it was by definition insect screening. The district court construed insect screening to mean a mesh of thin linear elements that permits ventilation but excludes insects. And it's undisputed that the mesh… Had anyone used TWP as insect screen, although it had been in existence for decades? We don't know that it had been in existence. Had anyone used TWP as insect screen, although it had been in existence for decades? There's no evidence in the record that it had ever been used. That's correct. There's no evidence in the record that it was so used. But what we're measuring against… So you're down five. Number two, as soon as you picked it up, it was evidence, and this is what Anderson's witness testified, that you could see right through it. It was so transparent that it almost was like it wasn't there. And if your project is to make a reduced visibility insect screen, and you have a wire mesh that is by definition on the claims of the patent insect screening, and as soon as you look at it, you can see right through it, that's an obvious place to start. And that's what happened. And starting from that, as your Honor's question, it's actually conceded that everything that Anderson did to modify it, once it thought to use it in this way, was obvious. Darkening was obvious. It had been done since 1916. Anderson's witnesses testified that it was obvious. The examiner found that it was obvious when he examined it. The TWP, the corporate representative for TWP, testified that other customers had actually darkened it already. He testified that it had been used in windows. So I think I'm at about number three now. Number four is that the TWP mesh was advertised as optical grade for looking through for use in windows. The problem with this is a lot of your analysis is pretty hindsight-making. Yes, it's obvious to paint it black and use a thin mesh to start with once somebody else has done it. But nobody did it for decades and decades. Doesn't that play into this? Doesn't that suggest that your analysis is laden with hindsight? Well, there's no doubt that you can't engage in hindsight, and this Court has applied a flexible test, the teaching, suggestion, motivation test, to guard against that. To the contrary, hindsight is always prohibited. The point of the flexible test is to make sure you can use any kind of evidence, but it still has to come from before the time of invention. You can't, as you've been doing in your verbal analysis, take the invention and use it as a way of describing what one of skill in the art would have done. You need to start at the other end and say, here's what was in existence before the time of invention, and here's why they would have taken that, even though nobody did it for decades. But, you know, the reason they should have done it is here. And you've got to kind of overcome this nobody did it for decades, because that militates against you pretty strongly. Well, I agree entirely with your statement of the law, and if I've been sloppy in the way I've been talking, that's only because what Anderson did was so closely linked to what was known in the art that it's hard to talk about them separately. It was known in the art to darken. It was known in the art to frame. Those are the two things that everybody agrees it was obvious for anyone of ordinary skill to have done. So we're back to why would anyone, which seems to be, as Judge Olson said so insightfully, that's really the only issue we have. I agree that a white PWP would even occur to one of skill in the art. And I've gone through. It was already insect screening, and it was transparent, and if that's the problem you're solving, that's the most obvious place to start. Anderson has made basically two different arguments about why you need to start there, maybe three. The first one is that it was too flimsy. But they claimed a flimsy insect screen. The only durability requirement they claimed was a tensile strength of 5,500 pounds per square inch, and before TWP mesh was modified, it had a tensile strength of 162,000 pounds per square inch, an order of magnitude greater than they claimed. So they can't argue against obviousness by saying it wasn't durable, and they didn't claim durability. The second thing they've argued is the cost of it, but they had market studies showing that there was a market demand for reduced visibility. That's why people did it. And there's also no cost claim in this claim construction. The third thing they've argued is that it was advertised for use as electromagnetic shielding, not for insect screening. But the way it was advertised doesn't matter. That's not what's relevant. It's an objective inquiry based on what the prior art was. Let me ask you this. Have you gotten most of it? I want to give you a chance. Go ahead. Well, I didn't want to jump in on your explication there, but the district court said, and sort of seemed to tee up the case this way, would an insect screen manufacturer of ordinary skill have found it obvious to use the TWP screening material that decreases reflectance value, and there's what we did, putting a black panel, et cetera, bonded and placed it in the window frame. Now, it seems to me that in terms of the obviousness analysis that we have here, the key point is would have found it obvious to use the TWP screening material. The district judge then, having looked at KSR, which came down during the pendency of the case, goes through what he refers to as a common sense analysis and said he would have done this and this. And then at the end he says, well, even assuming these secondary considerations, I don't think a prima facie case is the way out. Now, I think you've done a pretty good job of arguing your case here, but the only thing that concerns me is this is a summary judgment proceeding, and I'm having a bit of a difficult time seeing how there is not enough on the record to defeat summary judgment. And I'm thinking of the Armstrong report, which is certainly not a clue screen. I think you might have heard what the Supreme Court said in KSR. It's detailed. He explains why one of skill in the art, I mean, I've got the sites in here. You probably know them too. Yes. Well, one of skill in the art, low skill in the art, would not have looked at this. You also have us to read TWP's general manager or some official at TWP who says, this is flimsy. I don't know of anyone using this for an insect screen. And then there's other evidence, Gore sort of touting what Anderson did. I put all of this together, and I'm thinking, well, it may very well be that if this case goes back to the jury, how it will prevail. Who knows? But there's at least enough here on this question of whether one would look to Anderson, I'm sorry, whether one would look to TWP to defeat summary judgment. That's the problem I have. Okay. Let me break this into, my answer into two. Sorry to be long-winded, but I wanted to frame it for you, my thinking, where it was down, at least. No, I appreciate it. And I think your question goes, you know, first I want to address the primary factors, and then I want to address the secondary considerations, because I think there are differences there. On the primary factors, if Anderson's expert actually created an issue of fact on any of the things this court thinks about, the scope of the prior art, the differences in the level of ordinary skill, then perhaps you could avoid summary judgment. But he doesn't create any factual issues. Why doesn't he create a factual issue? Excuse me for interrupting. Go ahead. I want to, on the point of teaching away, I mean, he really, I think that seems to be a theme, if you will, of the Armstrong presentation. You know, the term I used, I guess, with Mr. Schultz, the TWP screen, at least the electromagnetic screen, teaches away from itself, for use as an insect screen. And the only argument that I've seen them make, that they've returned to again and again, is it teaches away because it's too clumsy. And Mr. Armstrong's expert report was based on a claim construction that the district court didn't adopt. So it probably seems to go beyond that. He says it teaches away because one skill in the art, you know, again, we have a low skill here, would not be inclined to look at this kind of a screen. And I think at one point he says, this is where the line is crossed into inventiveness. And that's a legal conclusion, Your Honor. He doesn't testify about the facts. He doesn't dispute that it actually was a mesh of thin linear elements with holes big enough to permit ventilation, yet small enough to exclude insects. He doesn't dispute that you can see right through it and that anybody picking it up could see that. It didn't take any skill to see that it was transparent. It didn't take any skill to see that it was an insect screen. That was its physical characteristics. What he says is that there's an issue of fact because there are these other things that wouldn't make you look there. You know, when you look at this court's test for what is pertinent art, Your Honor, we're playing off of Judge Schall's old, very artful presentation here. The examiner had TWP before him and still granted it. That's right. They have expertise. We have said often that the presumption jumps up a level  and they still grant the patent. How would you respond to that? Adding that to what Judge Schall said. As I read the examiner's rejection statement, or his changing to allow this, he was applying a version of the teaching suggestion motivation test that this court has said in Dye Star and the Supreme Court has said in KSR is obsolete. He said there was no specific teaching in the prior references to do what the inventors did, which is to combine it with the known methods of darkening and framing to make an insect screen. And because there was no specific reference, then he invalidated it. But that's not the test. This court held in Dye Star, and you recognized even recently in the chemical composition cases, that known problems in the industry can be the motivation. In Dye Star, the court said that making it faster, stronger, lighter, all of those can provide the motivation. And it's undisputed here that there's a motivation to make an insect screen less visible. That's what drove you there. In anybody looking at this, the physical characteristics themselves, it was an insect screen. By definition, on-the-claim construction, no one has appealed. In what Anderson was saying, it was an electromagnetic screen that one said, I will use this for an insect screen. Doesn't TWP have a bunch of other screens that it touts or advertises as purely insect screen? This is in another section of its catalog or its website, isn't it? You're right. There's no doubt that it had been advertised as a use for something else. But as this court knows, that's not determined to do. This court's test for whether it's pertinent art and whether you need to start with it, it's the in-rate claim test. And we've cited it in our brief, and it says it's pertinent if, even though if it's in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to the inventor's intention. This fits that. It logically would have. Out of all of the things... The question is, though, was it logical for one to go and look at it? Maybe logical is the word, but at least the question hasn't been... I don't know that that is the question. Because ordinarily, this court presumes that a person of ordinary skill knows the prior art. And even in the chemical composition cases recently where this court has found non-obviousness, there's no discussion of how difficult it was to go find it in the first place. The discussion always picks up starting with it and saying, even with the chemicals where you have this broad range of compositions, the question is whether, out of this broad range, there's any reason to select the one that you start with. In the Ortho McNeil case, the court said, no, it wasn't obvious to start there because you were trying to get a diabetes drug and you ended up with an anti-convulsive drug. So there was no way to tell that this was the right place to start. To make that case like this one, you'd have to be able to pick up the original composition and say, this looks like an anti-convulsive drug. And then it would have to come with a label saying appropriate for use as an anti-convulsive drug. Because that's what TWP was. You could pick it up and see, this is appropriate for use as an insect screen. Again, I come back to summary judgment. And Judge Alsop raised a very good point. He pointed out that the focus on this case, understandably, is TWP because that was the basis for the determination of obviousness. It may very well be that there's other stuff out there. And the record shows that there is. It's cited in our red brief. And the record shows that we have about 300 pages of wire screen catalogs. And every one of those advertises a wire that has dimensions and a mesh count that falls within the claims of this patent. And so, to Judge Alsop's point, an inventor didn't have to start with TWP. It could have started with any one of those and applied the known methods of darkening and framing and gotten an invention. That's a very fair point. But don't we really have to focus on TWP because that was the basis, as I just read, for the grant of summary judgment of obviousness? Well, your honors review this de novo. Obviousness is a question of law. On summary judgment, it's de novo. And so the question for this court is based on your own examination of the record. What's the right result? And I believe that the district court... And if we find an issue of fact, the right result is to send it back, right? If there's an issue of fact on the primary factors that changes the conclusion of obviousness, then, yes, you do have to do it. I promised about four minutes ago that I'd talk about secondary factors. At least, I want to make good on that. Both the Supreme Court and this court recently have held in a number of cases, KSR, Eggers-Asch, Rees-Point, Diastar, that when the evidence on the primary factors is undisputed and the legal conclusion is clear, it's appropriate to grant summary judgment, even if there are strong secondary considerations. And to return to your question about why there's no issue of fact here, that's why. Because even if you take the evidence in the light most favorable to Anderson on the secondary factors, it's not enough to overcome the obviousness that comes from the primary factors. And if the courts interpret... Isn't that a factual question, too? Isn't it a question of fact? The failure of others, they tried fishing line, that believed it could work. They tried bug zapper, electronic ways of having invisible shielding. That didn't really work. And they were still looking for something that worked, and this inventor did it. Why isn't that another factual concern? You can take all of that in the light most favorable to Anderson. It still doesn't make this non-obvious because of the primary factors. Ultimately, the question is whether the subject matter as a whole compared to the prior art, there's a difference such that it wouldn't be obvious. And here there just isn't. What about the copying? There isn't. Particularly the email to Joint Appendix 6003 that says we'll just knock off Anderson using Gore. Yes. The test for copying is whether there's an actual embodiment that was copied. And when you look at the product, the pellet and Gore marketed, and compare it to Anderson's product, they did not copy that embodiment. This court has pointed out. Still, that's pretty damning, isn't it? When you say we're going to knock off Anderson using Gore. I've got to confess, I wish it weren't in my record. But, so in terms of motivation, when you get to the actual test, copying just isn't motivation because companies all the time go out and do opposition research and they look at it, and then they do something based on that. So just going and looking at it and saying that because they did it, we now need to have a product, that isn't copying. Copying, according to the Iron Group case, says you have to have, the patented product has to be copied, not just the patent claims. Otherwise, every time there's infringement, it would prove, you know, obviousness. And that's just not the rule. You have your product with polymer and theirs is steel. Yes. There's polymer, it's not, it was polymer, it wasn't steel. It had a 21 by 17 mesh count, not a 50 by 50. The strands were five and a half thousandths of an inch rather than one thousandth, so they're actually five and a half. Their product is a success and theirs was a failure. Exactly. Which goes to the commercial success point and, you know, they argue that Pella's commercial success proves the non-obviousness of their product. That's not true because there's no nexus. No, but we're not looking at the non-obviousness of their product. We're looking at the non-obviousness of the claims. That's exactly right. Now, if your product falls within the claims, is it evidence that those claims are indeed commercially successful? Only if our product doesn't have any other unclaimed factor that contributed to the success. That would apply, but I think it's fair that, and perhaps another factual point, that your commercial success does bear on the success of the claim convention. I think the right way to look at it is to see there are actually two products in this record that fell within the claims of the patent. One of them was Anderson's product. It fell within the claims and it was a flop. Pella's product also fell within the claims and succeeded. That proves, just by that contrast, that the claims itself isn't worth making it commercially successful. There's something else going on. Is that a factual matter? In other words, maybe the facts would show that you had a great advertising campaign. Maybe you had Britney Spears and Michelle Pfeiffer selling your screen and they had a really crummy one with Judge Rader trying to sell it. I mean, that would all be factual, wouldn't it? Well, those are certainly factual issues, but this Court has granted summary judgment over those things and has found a failure to prove a secondary factor based on a lack of nexus. And that's the case that we have. Well, it's been a year to be commended for your candid explication of your wish that that document wasn't in the records. It's always refreshing to see that. I can do about that. The Court and counsel, the brothers at the bar, have exchanged a wry smile about it. But anyway, what I want to ask, just as a housekeeping question, I assume that this is not a case where you concede infringement. That's correct. Yeah, I mean, we do see sometimes someone says to tee it up for summary judgment and say, look, we acknowledge you meet the limitations of the claim, but it's invalid. You vigorously dispute. I just want to make sure. I thought that was the case in response to your question, Judge Alsop. I just want to make sure. No, that's correct. We do dispute. There hasn't been any motion on infringement. It hasn't been litigated. We oppose it. For purposes of summary judgment and taking the evidence in the light most favorable to Anderson, I think it's fair to take it in that light and examine that. But because of the reasons we discussed, there's no nexus. May I ask one further question? Please. The other side had an expert who heard quite a lot about that expert. But did you have a counter-expert at this point? Yes, we did. What was that expert's name? Your Honor, I'm going to have to go back to the record and do it. That's okay. We didn't include that in the appendix materials as much because for purposes of summary judgment, we have to take the evidence in the light most favorable. All right. We'll go back to our expert. That might have shown that there's actually a speaker. That doesn't do me any good in summary judgment. Okay, good. Were we going to hear from Ms. Copeland? Ms. Copeland is going to address the issue of dismissing the claims without prejudice that applies uniquely to Gore. Good morning, Your Honors. The district court did not abuse its discretion when it dismissed Gore's counterclaim without prejudice, only with respect to claims not asserted by Anderson. This broad counterclaim is a vestige of the original pleadings in this case.    the district court did not use its discretion when it dismissed Gore's counterclaim without prejudice. Gore wanted to clear up any roadblock that could prevent this court from holding jurisdiction of that appeal. In so doing, it moved to the district court to dismiss its counterclaim without prejudice, and the district court conceded all arguments from both sides and agreed that it would not be prejudicial to Anderson to dismiss that counterclaim without prejudice. Okay. Thank you, Ms. Copeland. Thank you. Mr. Schultz, the jury above. Thank you, Your Honor. Briefly, just a few points here. First on the point made by counsel on the definition of inter-extremism that the court did, there's two points to make on that. One, of course, is that it's not the screening material itself that's the subject of the patent. It's not within the administration unit. And that analysis is de jure after the fact. Prior to the patent coming into existence and when the inventors were coming up with this, TWP, of course, was not screening material. Not a single person had ever referred to it as screening material. So, in fact, it was not screening material. By law, in hindsight, after the patent had been before the district court for judgment and litigation, he had to do a legal claim construction. But for the purpose of uncoordinated skill and hard time to solve the problem, it was, in fact, not the exact screening material. With regard to a couple of the secondary considerations such as in the spirit of Judge Schultz kind of explicating his thinking, I can see many potential areas of factual dispute. But this is also very elemental technology with elemental skill levels and it seems to me that one skill in this art may well have tried all particular meshes and screens and then painted them black. This is well known in the art. Why can't we follow the line of reasoning given by the district judge without too much concern about the facts when the technology is so simple? I'm glad you asked that question because the technology at the end of the day really isn't simple. If we step back and we look how long insect screens have been in existence, how long Pella has been in the business of making insect screens, and a long-felt need to have a less ugly insect screen. There were a lot of incentives in that regard to try to find something ordinary, skill in the art, insect screens, designed to work for a low head, tried various things. Mr. Armstrong tried fishing screen. He tried plastic, hopefully holds it. Pella at one time tried rolling the screen up and called it rolled screen. And none of them were able to come up with it, come up with an answer. The people that actually came up with the answer, the inventors here were PhDs. They were in Anderson's think tank, asking research. It wasn't until you had somebody going way outside the box that the solution to this problem came up. It's only in hindsight that one can say it's really not all that complicated. But actually optics and what makes things less visible actually is very complicated. So I would submit that it's only simple in hindsight because if it were really that simple, I know this sounds trite, but if it were really that simple, sometime in the last 80 years when Pella's been in existence, somebody would have come up with the answer. Let me ask you one question. Soon to the moment that the inventors in this case have not looked at all at the TWP screen, they had just come up with the claims that we see there before us. And instead of the situation we have here, the other side was coming in and saying, well, the TWP screen, the electromagnetic screen was out there, and it rendered these claims obvious. What would your response be to that? I think that the response would be exactly the same for this reason. I mean, we're in the realm of hypothetical, but if I may run with the picture on it. If these particular inventors had come up with this set of claims without having come across TWP, they wouldn't have done so by using their Ph.D. expertise to look at the optics and physics of what makes things like this. You're sort of picking up a little bit on what Judge Alston was saying. I think the invention story would have been applying computer models and modeling to wires of infinite varieties and using all kinds of computer-aided design materials and then coming up with a set of claims like that. I think that's the only way that without resort to the material here, they wouldn't have come up with it. And then I think you're back to... That's not facts for now. I don't know how to explain that beyond that. I guess I've got a couple minutes left. On the commercial success and what their material is made out of, it may be made out of a polymer, but we very clearly dispose of polymer in column two of our patent. And so it just so happens that the commercial bottom we have in column two, about line 28 or 29, say, alternatively, the screen elements may be made of ultra-high molecular weight polyethylene. So there are certain non-metal fabrics that we propose. But compared to your product, where you can stick your finger through it, it was a failure. Their product is a success because it's made stronger. But here's... So it may be... But it is not a carbon copy of your commercial product. Interesting point, Your Honor. TWP was never used in a commercial product. This is too expensive. You literally couldn't manufacture it. Was this just one of these patents designed to block the competitors from coming? No. At the end of the day... What did it contribute to the useful arms? Here's what it contributes. That the makeup of TWP, in other words, TWP was an embodiment that they were actually made that had the patent claims. It was not a material that could be commercially made. But they tried to make a cheaper material that mimicked TWP's characteristics. In other words, thin wires closely spaced together on a mesh copy. And those were a couple of counterintuitive things in the optics industry. If you took a lot of wires and put them very close together, then you'd actually have something less visible. That was counterintuitive. Here's the thing. I've got to come back to what the bigger picture bothers me about this patent. Is that you came up with this idea of using this very expensive stuff that is not practical in the real world. You can't make a practical product out of this too expensive and stick your finger through it. But you used that to get a claim that completely obliterates the competition. And the slightest improvement over the prior part was picked up by that claim 22. That's not what happened. That's what it is. Is that wrong? It's the Home Depot story. Anything slightly better than what's available at the Home Depot, you try to claim that based on something that doesn't work. Let me respectfully dispute that charge. Here's what happened. The TWP fabric ended up being, especially after you painted it black, much less visible. So what they did was say alright, what is it that made it much less visible? It was the fact that it had very thin wires, very closely spaced together. And that fact that you learned from TWP, they claimed that, but when it came time to actually find a material to manufacture it, they had to find a different material, because the TWP material itself, as we pointed out, even after the fact, just wasn't suitable for manufacturing. But what was learned from this, this counterintuitive discovery that they made, that putting these wires closer together would make something less visible. Mr. Schutz, one final question maybe. 103 tells us you relied very heavily on your impressive invention story, but 103 tells us clearly that the method of invention cannot negatively impact the ability, meaning that the method of invention is kind of irrelevant. It is not in this context, if the method of invention was conducted by people of extraordinary skill in the art of thinking outside the box, that's certainly relevant to what one of ordinary skill would learn. It's not that the invention story itself drives the decision, but it's what other factors So that phrase, 103, is really just a rival flash of genius to us. Correct. I have the right answer, but yes. Not such a great movie, by the way. No, that's all right. Thank you. Thank you very much. Both counsel, all three counts. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.